## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CIRCLED WAGONS MANAGEMENT, LLC d/b/a ABQ RAW,** | |
| *Plaintiff,* | **COMPLAINT FOR DAMAGES BASED ON COPYRIGHT INFRINGMENT** |
| **v.** | |
| **PUBLIC BROADCASTING SERVICE ("PBS"), WNET, WGBH EDUCATIONAL FOUNDATION d/b/a WGBH, and MIDNIGHT FILMS, LLC,** | **Demand for Jury Trial** |
| *Defendants,* | |

Plaintiff Circled Wagons Management, LLC d/b/a ABQ Raw, ("ABQ Raw" or "Plaintiff") for its complaint against Defendants Public Broadcasting Service ("PBS"), WNET, WGBH Educational Foundation d/b/a WGBH ("WGBH"), and Midnight Films, LLC ("Midnight Films") (each a "Defendant," and collectively, the "Defendants") by and through its undersigned counsel, alleges upon personal knowledge as to its own conduct, and on information and belief based on the investigation of Plaintiff's counsel, as to all other conducted alleged herein, as follows:

## I. INTRODUCTION

1.      This is a civil action for copyright infringement related to each Defendants' role in the willful and unauthorized copying, distributing, and displaying of Plaintiff's copyrighted video footage.

2.      Plaintiff is an emerging independent documentary filmmaking and news gathering organization founded by two journalists in Albuquerque, New Mexico.

1

3.      In late January 2021, Plaintiff released *Anatomy of a Riot: DC Capitol Under Siege*. The documentary film features Plaintiff's harrowing, on-location video footage of supporters of outgoing President Donald Trump violently storming the US Capitol on January 6, 2021.

4.      Shortly thereafter, Defendants illegally copied a portion of *Anatomy of a Riot: DC Capitol Under Siege* (the "Footage") and subsequently used it in two versions of their own film, titled *American Insurrection*, both of which aired on PBS' "Frontline" program and were published on PBS websites in markets across the US. Despite Plaintiff's repeated objections upon discovering these uses, the Footage remains publicly displayed by Defendants to this day.

5.      The closing credits of Defendants' *American Insurrection* films falsely list Plaintiff as having contributed "Additional Materials." This presentation—intended to convey that Defendants' use of Plaintiff's Footage was lawful—was false. Plaintiff did not provide any materials to Defendants and was never even informed of the use, let alone contacted by Defendants for permission.

6.      Since first publishing *Anatomy of a Riot: DC Capitol Under Siege*, Plaintiff has frequently licensed segments of the film, including the Footage at issue, on a per-second basis to other documentary film productions that, like *American Insurrection*, focused on the events of January 6, 2021.

7.      Plaintiff holds Defendants and their storied programming in the highest regard, recognizing their significant contributions to journalism and public discourse. However, Defendants' repeated refusal to pay a reasonable fee for their unauthorized use of the Footage or cease it use has made litigation unavoidable. Therefore, Plaintiff reluctantly initiates this suit to

protect its rights and seek fair and just compensation for the use and the ensuing legal fees it has been forced to incur.

8.    Defendants' conduct shows a brazen and reckless disregard for Plaintiff's rights, thereby warranting enhanced statutory damages for willful copyright infringement.

## II. THE PARTIES

9.    Plaintiff ABQ Raw is an independent documentary filmmaking and reporting organization headquartered in Albuquerque, New Mexico. ABQ Raw is the sole owner of the copyrighted Footage that was copied, distributed, displayed, or otherwise used by Defendants in violation of Plaintiff's exclusive rights under the Copyright Act.

10.    Defendant Public Broadcasting Services ("PBS") is a Virginia nonprofit corporation that maintains its principal place of business at 1225 South Clark Street, Arlington, VA 22202, and conducts business within the State of New York, maintaining an office address at 825 8th Avenue, New York, NY 10019.

11.    Defendant WNET, a New York non-profit corporation chartered by the Board of Regents of the University of the State of New York, holds the license to operate the primary PBS member television station in the New York City area and maintains its principal place of business at 825 8th Avenue, Floor 14, New York, NY 10019.

12.    Defendant WGBH, a Massachusetts non-profit corporation, holds the licenses to operate all of the PBS member television stations in Massachusetts, including its flagship station, WGBH-TV, which produces the documentary series "Frontline" that airs on PBS television stations throughout the United States, including WNET in New York. Defendant WGBH maintains its principal place of business at One Guest Street, Boston, MA 02135.

13.     Defendant Midnight Films is a for-profit New York corporation that maintains its principal place of business at 642 Greene Avenue, Brooklyn, NY 11221.

14.     Whenever in this complaint it is alleged that any Defendant committed any act or omission, it is meant that the Defendant's officers, directors, vice-principals, agents, servants, directors, executives, management, or employees, subsidiaries, or affiliates committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of that Defendant or was done in the routine normal course and scope of employment of the Defendant's officers, directors, vice-principals, executives, management, agents, servants, or employees.

## II. JURISDICTION AND VENUE

15.     This is a civil action for copyright infringement under the Copyright Act of 1976 (the "Copyright Act" or the "Act") and 17 U.S.C. §§ 101 *et seq*. and 505 *et seq*.

16.     This Court has original subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338 (copyrights).

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 35 N.Y.C.P.L.R. §§ 302(a)(1)-(3) because Defendants (1) committed copyright infringement (2) in and expressly aimed at the forum state of New York (3) and caused harm in this District to Plaintiff.

18.     Venue is further proper in this District pursuant to 28 U.S.C. § 1400(a) (venue for copyright cases) because Defendants PBS, WNET, and Midnight Films are corporations headquartered or otherwise officed in this District.

19.     This Court has *in personam* jurisdiction over Defendant because the Defendants availed themselves of the privileges of conducting business in this District and the State of New

York and incurred benefits from the alleged infringement, such that this Court's assertion of jurisdiction over Defendants does nothing to offend traditional notions of fair play and due process.

## IV. FACTUAL ALLEGATIONS

### A. The Importance of US Copyright and Bundle of Rights

20.     Copyrights are the legal title to intellectual property by which creators of original works, such as documentary films, protect their exclusive moral and economic rights to exploit those works.

21.     Respecting and defending the financial value and exploitation rights of creators' copyrighted works is a bedrock of US democracy, considered so important that the Founders enshrined the U.S. Constitution with specific references to copyrights, and which expressly gave Congress the power to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const. Article I, Section 8. "Copyright law encourages people to create original works and thereby 'ultimately serves the purpose of enriching the general public through access to creative works.'" *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526 (1994).

22.     The United States Supreme Court found that by "establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

23.     Section 106 of the Copyright Act (the "Act") grants copyright owners the exclusive economic rights and control for value of their works. The Act makes it illegal to reproduce, create derivative works from, distribute, publicly perform, or publicly display

copyrighted work except in limited instances, and provides for damages if any of these rights are infringed.

**B. Background on Plaintiff & the Footage**

24.    Plaintiff ABQ Raw is a documentary filmmaking and news gathering organization focused primarily, though not exclusively, on the people and events of Albuquerque, New Mexico.

25.    ABQ Raw was founded in 2014 by regional journalists Nicholas Layman and Mark Aragon in response to the widespread reduction in journalism funding and resources, which left Albuquerque facing a significant lack of local news coverage and reporting options.

26.    Mr. Layman holds a bachelor's degree in journalism from the University of New Mexico and has received numerous awards from the New Mexico Broadcasters Association and Associated Press of New Mexico for his reporting throughout his career.

27.    Before retiring in 2016 to turn his attention to journalism, Mr. Aragon served as a Public Information Officer with the Albuquerque Police Department. In this position, he crafted policy on how officers should interact with the media and continues to teach law enforcement media and Public Information Officer classes to law enforcement professionals in New Mexico and beyond.

28.    ABQ Raw operates across numerous media sources including its own website (abqraw.com), its own YouTube channel (YouTube.com/Abqraw), and numerous social media accounts (Tik Tok, Facebook, Twitter, Instagram, etc.). A screenshot showing a typical abwraw.com landing page is shown here:



29.     Despite the founders' lack of editorial management experience and ABQ Raw's localized focus, the operation has amassed a sizeable audience since its inception. For instance, its YouTube channel now boasts over 29 thousand subscribers and nearly 5 million views.

30.     ABQ Raw doesn't merely publish its own media; it also licenses it for others to use, generally for a fee. The organization typically does not permit the use of its media without a license, as indicated by the warning on the abqraw.com landing page: "*Please Request Permission Before Disseminating on Other Social Media Platforms*." Additionally, ABQ Raw actively solicits licensing opportunities (and news tips) from the public. For example, its' YouTube channel states, "*For news story suggestions or inquiries please contact ABQ RAW at by clicking the business inquiries link below*."

31.     Among the media produced by ABQ Raw that extends beyond Albuquerque is the documentary film *Anatomy of a Riot: DC Capitol Under Siege*. The film examines the events of the January 6, 2021 riots at the US Capitol (the "January 6 Riots"), which sparked when former President Donald Trump incited his followers to storm the US Capitol in an attempt to disrupt the certification of the vote confirming Joe Biden as President. The documentary presents a harrowing, first-person perspective from the West side of the Capitol that day. It has been

viewed over 12 thousand times on ABQ Raw's YouTube Channel alone (https://youtu.be/U3g
VJ9TeBV4?si=uvT_7BicsYcws80F).

32.     The footage used in *Anatomy of a Riot* was filmed by ABQ Raw founders, Mr.
Layman and Mr. Aragon as they documented the maelstrom unfolding around them. Both
believe they risked their lives to capture the footage – particularly given the hostility that Mr.
Trump has expressed toward the media, which his followers have emulated to violent effect.[1]

33.     As depicted in *Anatomy of a Riot*, Mr. Layman and Mr. Aragon personally
witnessed numerous injuries to law enforcement officers and civilians and were repeatedly
overcome by tear gas and pepper spray, the effects of which lasted for many hours. At one point,
Mr. Aragon even witnessed the death of a civilian from medical complications.

34.     After emerging from the Capitol with their footage intact, Mr. Layman and Mr.
Aragon returned to Albuquerque, where they edited the raw footage into what would become
*Anatomy of a Riot*, which they published to the ABQ Raw YouTube channel and other platforms
starting on January 19, 2021.

35.     *Anatomy of a Riot* provides an exceptional first-hand perspective of the January 6
Riots, capturing the chaotic and dangerous nature of the events at the Capitol and underscoring
their historic significance and impact on the individuals involved.

36.     Plaintiff's displays of *Anatomy of a Riot* included a watermark ABQ Raw logo on
the upper left portion of the frame at all times.

---

[1] *See, e.g.*, Committee to Protect Journalists, '*Murder the Media': What the Jan. 6 attack on the
Capitol meant for US journalists* (January 6, 2023), available at: https://cpj.org/2023/01/murder-
the-media-what-the-jan-6-attack-on-the-capitol-meant-for-u-s-journalists/.



37.    Plaintiff promptly registered *Anatomy of a Riot* with the United States Copyright Office. It bears the Registration Number PA 2-294-533 and an Effective Date of April 6, 2021. A true and correct copy of the film's Registration Certificate is attached hereto as Exhibit A.

38.    Shortly after publishing *Anatomy of a Riot*, Plaintiff began receiving licensing requests from other documentary film producers wishing to incorporate some of ABQ Raw's footage into their own projects focusing on the events of January 6, 2021. Examples of these requests include:

- *My name is REDACTED and I'm an Archival & Clearance Supervisor with REDACTED, an Emmy Award winning production company in Los Angeles, CA. REDACTED is currently producing a documentary series for one of our domestic cable news networks called REDACTED in which each episode examines the significant cultural, entertainment, geopolitical, and societal events within a particular decade. Our series currently focuses on the 2010's and our producers found content from your YouTube channel particularly compelling.*

- *REDACTED is an award-winning documentary production company. We are producing a documentary film about the year 2020 –a retrospective covering Covid-19, the BLM movement, and the election cycle, through January 6th and the Inauguration. The challenges and hopes of that pivotal year. We would like to include a few seconds of your incredibly powerful footage from the January 6th storming of the Capitol, in our documentary.*

9

- *I'm the executive producer of REDACTED's documentary REDACTED for REDACTED, which we're putting together out of my small indie prod co REDACTED in REDACTED. [...] REDACTED has done a terrific job on this one, pulling together interviews with many Proud Boys, protesters, lawmakers from both sides, cops and others - all people in the thick of the action. [...] REDACTED has included in his film a total of 59 minutes and 14 seconds of astonishing video material shot on January 6th by 54 different video sources (!), most of which we have now licensed from the rightsholders. [...] One of those video sources is you guys, and as you know we're looking to license up to 3 minutes of your excellent footage.*

39.    In keeping with industry standards, Plaintiff generally licensed footage from *Anatomy of a Riot* to other documentary film producers on a per-second basis, charging a set fee for each second of footage sought by the licensee.

40.    While each production licensed different durations of *Anatomy of a Riot* from ABQ Raw, most, if not all, sought the same segment used by Defendants in *American Insurrection*—a graphic sequence depicting the first minutes of the Capitol breach.

41.    Given Mr. Layman and Mr. Aragon's limited experience with licensing at the time, they were initially uncertain about the appropriate rate for footage from *Anatomy of a Riot*. However, through their negotiations with licensees, they quickly determined its prevailing rate based on what the market for the footage would support.

42.    Since its release, ABQ Raw has repeatedly licensed footage from *Anatomy of a Riot* to media organizations and documentary filmmakers, making this a profitable part of their business model.

**C.  Defendant's Wrongful and Infringing Conduct**

43.    Sometime after ABQ Raw published *Anatomy of a Riot*, Defendant Midnight Films copied all or part of *Anatomy of a Riot* from Plaintiff's YouTube channel, without Plaintiff's permission.

44.    Defendant Midnight Films then incorporated six seconds of footage from *Anatomy of a Riot* (i.e., the Footage) into its own retrospective documentary on the January 6 Riots, *American Insurrection*, without Plaintiff's permission.

45.    Upon information and belief, Defendant Midnight Films had previously entered into a production and/or distribution deal with Defendant WGBH, and possibly others, to create one or more documentary films for the acclaimed PBS investigative news program, Frontline. *American Insurrection* was one of these films.

46.    Upon information and belief, Defendant PBS distributes or facilitates the distribution of Defendant WGBH's Frontline program to independently operated PBS member stations across the US, which air the program in their local markets and publish it on their websites.

47.    On or about April 13, 2021, PBS member stations around the country, including WGBH and WNET, aired the Frontline episode containing *American Insurrection*, which included Plaintiff's stolen Footage. On or around the same time, they also published *American Insurrection* on each member station's webpage as part of Frontline's episode library.[2]

48.    On or about January 4, 2022, PBS' Frontline program aired and published an updated version of *American Insurrection* that incorporated additional third-party footage apparently obtained since the initial broadcast. Frontline presents each version as a distinct film or individual episode, differentiated by the year they were created and the date they were released, as can be seen on WGBH's website:

---

[2] *See, e.g.*, https://www.thirteen.org/programs/frontline/american-insurrection-65qeoo/; and https://www.pbs.org/wgbh/frontline/documentary/american-insurrection/.



49.    Both versions of *American Insurrection* incorporate the same six seconds of

Plaintiff's watermarked Footage, which can be seen in the following screengrab example:



50.    Both versions of *American Insurrection* credit dozens of individuals and entities

as having contributed footage or other materials to the production.

51.    Both versions of *American Insurrection* credit Plaintiff ABQ Raw as having

provided "Additional Materials" for the films, despite Plaintiff never providing any audiovisual

materials to Defendants and no Defendant ever contacting Plaintiff to obtain a license or request

permission to use such material.



52.     Plaintiff is informed and believes that this accreditation was intended to give Frontline viewers the false impression that Defendants' use of Plaintiff's Footage was lawful when it was not.

53.     While Plaintiff's Footage was widely considered "particularly compelling" or "excellent" enough to command a premium licensing fee from other documentary productions (*see* Para. 38, supra), its absence would not have impacted *American Insurrection* significantly enough to excuse the unauthorized uses, particularly given the volume of other footage available to and used by Defendants. Therefore, Defendants used Plaintiff's Footage simply to enhance the value of their own work.

54.     By using the Footage without a license or permission from Plaintiff, and without notifying Plaintiff of the use, Defendants deprived Plaintiff of the opportunity to negotiate a reasonable license fee for Frontline's use of the Footage. Had Defendants afforded Plaintiff this opportunity, Plaintiff would have required two distinct licenses and corresponding fees for the Footage's usage in two distinct iterations of *American Insurrection*.

55.     Plaintiff did not become aware of Defendants' unauthorized use of the Footage until Frontline aired the second version of *American Insurrection* on January 4, 2022. Shortly thereafter, Plaintiff reached out to Defendant PBS via email to express its objection.

56.     On January 10, 2022, Lindsey Schneider, a representative of Defendant Midnight Films, responded to Plaintiff via email, acknowledging the Footage's use and seeking to secure its continued use in *American Insurrection* stating, "We would like to license that footage from you." Ms. Schneider inquired about Plaintiff standard licensing rates and mentioned that Defendants would require license terms that included "*non-exclusive rights for all media, worldwide, in perpetuity*."

57.     The same day, Mr. Layman emailed a response to Ms. Schneider on behalf of Plaintiff. He informed her that Plaintiff considered Defendants' unauthorized uses of the Footage to be copyright infringement and emphasized that other documentary film producers had respected Plaintiff's rights and licensing terms.

58.     In his January 10, 2022 email, Mr. Layman quoted Ms. Schneider a higher rate than ABQ Raw's prevailing rate for *Anatomy of a Riot* footage. This rate added a punitive component to Plaintiff's prevailing rate due to the unauthorized nature of the *American Insurrection* uses and accounted for Ms. Schneider's unilateral imposition of post facto licensing terms (*non-exclusive rights for all media, worldwide, in perpetuity*) which Plaintiff would have otherwise freely negotiated.

59.     Defendants rejected this and all subsequent proposals from Plaintiff, refusing to consider any amount that Plaintiff deemed reasonable in light of the other licenses it had issued for its *Anatomy of a Riot* footage.

60.     During this time, Plaintiff repeatedly demanded that Defendants cease using its copyrighted Footage in *American Insurrection*.

61.     Despite being acutely aware of Plaintiff's objection to the unauthorized uses of the *Anatomy of a Riot* Footage, and of Plaintiff's legal position, Defendants never took down the offending displays of *American Insurrection* from PBS member station websites and never provided a substantive explanation as to why its use of Plaintiff's Footage might constitute fair use.[3]

62.     Unable to resolve its claims against Defendants or even obtain a cogent explanation as to why Plaintiff's claims might lack merit, Plaintiff has been forced to initiate litigation, incurring additional and unnecessary legal costs.

63.     Plaintiff has frequently licensed segments of the film, including the Footage used by Defendants, on a per-second basis to other documentaries covering the January 6 Riots. Because Defendant's unauthorized use was substantively similar in amount and context to these licensed uses, Defendants deprived Plaintiff of licensing revenue that it would have earned if they had properly licensed the Footage.

64.     By exploiting (and continuing to exploit) Plaintiff's copyright video Footage without license, permission, or legal excuse, and with full knowledge that such authorization was required by law, Defendants have willfully infringed ABQ Raw's rights in violation of the Copyright Act and caused damages in an amount to be determined at trial.

**D. Background on Defendants**

---

[3] Plaintiff remains unpersuaded by Defendants' totemic assertion of "*fair use*," offered without substantive application.

65.    Collectively, Defendants hold many millions of dollars in total assets,[4] and as broadcasters and media producers of the highest order, they possess sophisticated knowledge about intellectual property rights.

66.    Collectively, Defendants own and manage various intellectual properties, including copyrights, trademarks, and patents, and routinely enforce their rights in assets such as brand names, logos, media productions, technologies, and more.[5]

67.    The PBS Defendants (PBS, WGBH, WNET) utilize a copyright disclaimer on their websites, including the websites that host the Frontline program, indicating that Defendants understand the importance of copyright protection and intellectual property. For example: WNET's website, www.thirteen.org, contains the following language as part of its Terms of Service:

> **Section 2.1**.  *The contents of the Services, including the Site, are intended for your personal, noncommercial use. **All materials published on or through the Services (including, but not limited to articles, photographs, images, illustrations, audio clips or programs and video clips or programs, also known as the "Content") are protected by copyright and owned or controlled by WNET or the party credited as the provider of the Content**. **You shall abide by all applicable copyright laws and additional copyright notices, information, or restrictions contained in any Content accessed through the Service**. **You may not modify, publish, transmit, participate in the transfer or sale of, reproduce, create new works from, distribute, perform, display, or in any way exploit, any of the Content or the Services (including software) in whole or in part**, except as provided in Sections 2.2 and 2.3 of these Terms of Service.*

> **Section 2.2**.  *Where explicitly permitted, you may download the Content and other downloadable items displayed on the Services for **personal use only, provided that: (a) you maintain all copyright and other notices contained therein; (b) you***

---

[4] *See, 2023 PBS Financial Report, available at:* https://www.pbs.org/about/about-pbs/financials/; *GBH Annual Report 2023, available at:* https://reports.wgbh.org/2023/financial/; *and WNET & Subsidiaries Consolidated Financial Statements for Fiscal Year Ended June 30, 2023, available at:* https://www.wnet.org/about/financials/.

[5] *Id.*

*do not modify the content; (c) you do not use the content in a manner that suggests WNET promotes or endorses your, or any third-party's, causes, ideas, web sites, products or services; and **(d) you do not use the content in any way that is unlawful or harmful to any other person or entity. Copying or storing of any Content for other than personal use is expressly prohibited without prior written permission from WNET's Rights and Clearances Department, or the copyright holder identified in the copyright notice contained in the Content***.

**Section 2.3**. *You may link to the Content on your personal web site, blog, or similar application for personal, noncommercial purposes or on your 501(c)(3) Nonprofit Corporation web site, blog, or similar application for noncommercial purposes only. **You may display or excerpt from the Content provided that you obtain prior written consent***, by contacting permissions@wnet.org. Your right to link, and potential right to display or excerpt from the Content, are contingent on abiding by the following provisions: (a) the links must redirect the user to the WNET Services when the user clicks on them; (b) you do not insert any intermediate page, splash page or other content between the links and the applicable WNET Services page; (c) the use or display does not suggest that WNET promotes or endorses any third party causes, ideas, web sites, products or services; (d) the fundamental meaning of the content, including the headlines and summaries, is not changed or distorted; and (e) you do not modify the stories or other content that are linked to by the Content.*

**Section 2.4. If you wish to use the Content in any way not enumerated in this Section or elsewhere in these Terms of Service, express prior written consent is required**. *Requests for information regarding web posting, reprint, transcript or any licensing of Content, should be sent to* [permissions@wnet.org](mailto:permissions@wnet.org).
**(Emphasis added.)**

Defendant WNET's Term of Service for [www.thirteen.org](http://www.thirteen.org) is available at:

[https://www.thirteen .org/about/terms-of-service/](https://www.thirteen.org/about/terms-of-service/). WNET also includes a copyright notice

("©2024 WNET") at each thirteen.org webpage. WNET maintains similar terms and notices on

its other member station websites, while Defendant WGBH maintains similar policies at

[https://www.wgbh.org/privacy/terms-of-use](https://www.wgbh.org/privacy/terms-of-use) and includes a copyright notice ("©2024 WGBH")

on each of its webpages, while Defendant PBS maintains its at [https://www.pbs.org/about/about-pbs/terms-of-use/](https://www.pbs.org/about/about-pbs/terms-of-use/) and includes the notice "© 2024 Public Broadcasting Service (PBS)."

Defendant Midnight Films does not, upon information and belief, operate a website or otherwise display its works to the public, except through its contracted partners such as Defendant WGBH.

68.     The PBS Defendants are no strangers to using the courts of the Southern District of New York to enforce their rights against those who infringe their intellectual property, demonstrating their sophistication and awareness of their rights and responsibilities under the Copyright Act. *See, e.g.*, *WNET, et al. v. Aereo, Inc.*, 871 F. Supp. 2d 281, 282 (S.D.N.Y. 2012) ("Plaintiffs, a group of corporate entities engaged in the production, marketing, distribution, and transmission of television programs, filed a complaint against Defendant [...] contending that [its] services are unlawful."); *WNET, et al. v. DIDJA, Inc., et al.*, 1:22-cv-05693-VEC, Dkt. No. 1, *1 (S.D.N.Y. July 5, 2022) ("an action for copyright infringement and false endorsement arising out of Defendant' willful and unauthorized reproduction and retransmission of [Plaintiffs'] copyright-protected television programming."); *WPIX, Inc., et al. v. IVI, Inc, et al.*, 1:10-cv-07415-NRB, Dkt. No. 1, *1 (S.D.N.Y. September 28, 2010) (WGBH Educational Foundation, plaintiff) ("The purpose of this copyright infringement action is to restrain defendants from exploiting without authorization, and violating plaintiffs' rights in, some of the most valuable intellectual property created in the United States."); *and Am. Broad. Companies, Inc. v. Aereo, Inc.*, 1:12-cv-01540-AJN-HPB, Dkt. No. 1, *3-4 (S.D.N.Y March 1, 2012) (Public Broadcasting Service, plaintiff) ("Unless restrained by this Court, plaintiffs' loss of control over the transmission of their copyrighted programming, [defendant's] usurpation of plaintiffs' opportunities to license content [...] and other unlawful conduct contemplated by [defendant] threaten plaintiffs with substantial irremediable losses.").

69.     Because Defendants are sophisticated broadcasting and media production entities that regularly contemplate the creation, ownership, display, distribution, marketing, licensing,

sale, and enforced protections of intellectual property, they were aware, or at minimum, should have been aware, of Plaintiff's rights as a copyright holder and Defendants' responsibilities under the Copyright Act when they wrongfully used Plaintiff's copyrighted Footage.

70.    Defendants knew or should have known that their uses of Plaintiff's copyrighted Footage constituted a violation of Plaintiff's intellectual property rights, and that the infringing uses were willful and reckless.

71.    No legal doctrine grants nonprofit 501(c)(3) corporations, even prominent entities like the PBS Defendants, a special license to avoid liability for copyright infringement simply because of their nonprofit status.[6]

72.    No legal doctrine holds that a defendant's nonprofit status entitles it to mitigated damages once that defendant has been held liable for copyright infringement.

73.    Because Defendants acted in concert to achieve the full scope of the infringements described herein, they each bear joint and several liability for all causes of action.

## V. CAUSE OF ACTION

### INFRINGEMENT OF COPYRIGHT PURSUANT TO 17 U.S. CODE § 106

74.    Plaintiff incorporates herein by reference each and every allegation contained in each paragraph above.

75.    Plaintiff is, and at all relevant times has been, the copyright owner with exclusive rights under United States copyright with respect to the Footage, in which it enjoys a valid registration per Exhibit A.

---

[6] An alleged infringer's nonprofit status may positively influence the fair use analysis under 17 U.S.C. § 107(1), however, it is neither independently determinative nor particularly weighted, unlike other fair use considerations, such as transformativeness or market usurpation.

76.     Among the exclusive rights granted to Plaintiff under the Copyright Act are the exclusive rights to reproduce (copy), distribute, display, perform, and create derivative works from its copyrighted Footage per 17 U.S.C. §§ 106.

77.     A transmission of a copyrighted work constitutes a public performance per 17 U.S.C. § 101.

78.     Defendants, without Plaintiff's permission or consent, copied all or some of Plaintiff's copyrighted documentary, *Anatomy of a Riot: DC Capitol Under Siege*, incorporating a six-second segment (the Footage) into Defendants' own documentary film, *American Insurrection*. Defendants distributed *American Insurrection* to PBS member stations nationwide as part of the PBS program Frontline, which then broadcast the film and displayed it to the public on their websites. About a year later, Defendants created an updated version of *American Insurrection* and again distributed it to PBS member stations, which broadcast it and published the updated version on their websites alongside the original.

79.     Defendants used six seconds of Plaintiff's copyrighted *Anatomy of a Riot* footage in *American Insurrection*. While this duration is small when viewed alongside the full runtime of either film, it was not a harmless, de minimis use. Plaintiff regularly licenses portions of *Anatomy of a Riot*, including the Footage at issue, to other documentary producers focusing on the January 6 Riots on a per-second basis, and would have done so for its use in *American Insurrection*.

80.     Defendants use of the Footage in *American Insurrection* deprived Plaintiff of a license fee for the use.

81.     Defendants misleadingly credited Plaintiff as having willingly provided the Footage in *American Insurrection*'s closing titles, more likely than not for the purpose of giving the public the impression that the use was legitimate.

82.     Defendants have violated Plaintiff's exclusive right to reproduce, distribute, publicly display, publicly perform, and make derivative works of the Footage.

83.     Defendants never asked permission nor paid a licensing fee for the use of Plaintiff's copyrighted Footage despite Plaintiff operating a public website, YouTube channel, and numerous social media accounts where, *inter alia*, they solicit offers from potential licensors and can be contacted about such.

84.     Defendants never asked permission nor paid a licensing fee for the use of Plaintiff's copyrighted Footage despite Defendants knowing Plaintiff to be the Footage's author.

85.     Defendant never asked permission nor paid a licensing fee for the use of Plaintiff's copyrighted Footage despite Defendant knowing Plaintiff was professional documentary filmmaking and news gathering organization that licensed its work and maintained numerous avenues where it could be contacted about the licensing of its work.

86.     Plaintiff never provided authorization to Defendants or their partners, agents, members, licensees, affiliates, employees, contractors, customers, subscribers, or retailers to use, copy, publicly display, distribute, license, manipulate, or otherwise exploit the Footage.

87.     Plaintiff is informed and believes that the foregoing acts of infringement have been reckless and in total disregard of and with indifference to the rights to Plaintiff's copyrights and exclusive rights under copyright.

88.     Plaintiff has suffered damages as a direct and proximate result of Defendants' infringement of the copyrighted Footage.

89.     As a result of Defendant's infringements of Plaintiff's exclusive rights under copyright, Plaintiff is entitled to an award of statutory damages pursuant to 17 U.S.C. § 504(c), which amounts will be proved at trial.

90.     Defendants' conduct has caused, and any continued infringing conduct will continue to cause, irreparable injury to Plaintiff, unless enjoined by this Court. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction prohibiting infringement of Plaintiff's exclusive rights in Plaintiff's copyrighted documentary film *Anatomy of a Riot: DC Capitol Under Siege* by Defendants and any persons acting in concert with the Defendants.

## VII. JURY TRIAL DEMANDED

91.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury of all the claims asserted in this Complaint so triable.

## VIII. RELIEF REQUESTED

92.     WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

a.   Awarding Plaintiff damages derived from the infringing acts, in the maximum amount permitted by law with respect to each instance of Defendants' infringing use of the Footage, whether pursuant to actual damages under 17 U.S.C. § 504(b) or statutory damages under 17 U.S.C. § 504(c), including attorneys' fees and costs;

b.   Granting Plaintiff injunctive and other equitable relief enjoining Defendants, their respective officers, agents, vendors, servants, and employees, and all those acting in concert from directly or indirectly reproducing, publicly performing, publicly displaying, or distributing the copyrighted Footage;

c.   Awarding prejudgment interest to the maximum extent permitted by law;

d.   Awarding Plaintiff's attorneys' fees, costs, and expenses in this action

pursuant to 17 U.S.C. § 505 derived from Defendants' infringing acts; and

e.   Awarding such other and further relief as the Court may deem just and proper.

Dated: July 25, 2024.

Respectfully submitted,

*By: /s/ Bryan Hoben*
HOBEN LAW
Bryan D. Hoben, Esq.
1112 Main Street
Peekskill, New York 10566
347-855-4008
bryan@hobenlaw.com

*Attorneys for Plaintiff Circled Wagons*
*Management, LLC d/b/a ABQ RAW*

23